STATE OF NORTH CAROLINA ON RELATIONSHIP OF THE EMPLOYMENT SECURITY COMMISSION OF NORTH CAROLINA v. C. R. MONSEES, SOUTHMONT, NORTH CAROLINA.

(Filed 17 July, 1951.)

**1. Master and Servant § 58—**

What is an employing unit within the meaning of the Employment Security Act is not predicated upon the common law definition of master and servant or employer and independent contractor, but is determinable by the definitions set out in the statute.

**2. Same—**

Where the owner of sawmills contracts with the owner of timber to deliver to him lumber cut in accordance with specifications furnished, and thereafter contracts with individuals to operate the sawmills and other individuals as loggers upon an agreed price per thousand board feet, which individuals employ others to assist them in their work to the knowledge of the owner of the sawmills, who testifies that cutting and delivering lumber under the contracts is a part of his usual business, *held:* the sawmill owner is an employing unit within the meaning of the Employment Security Act. G.S. 96-8 (e), prior to the amendment of Session Laws of 1949. (G.S. 96-8 (g). (1)).

**3. Master and Servant § 62—**

The findings of fact of the Employment Security Commission are binding upon appeal when supported by competent evidence. G.S. 96-4 (m).

APPEAL by plaintiff from *Clement, J.,* September Term, 1950, of DAVIDSON.

This is a proceeding to determine whether the defendant is liable as an employer for contributions on the remuneration received by certain individuals who performed services under contracts for the said defendant during the third and fourth quarters of 1943, the years of 1944, 1945, 1946, and 1947, and the first and second quarters of 1948.

A summary of the facts found by the Employment Security Commission, which facts are supported by the evidence, is as follows:

1. C. M. Wall and Son, Inc. (referred to hereinafter as Wall), of Lexington, North Carolina, is an employer under the Employment Security Law of North Carolina and is engaged in manufacturing boxes from rough lumber. It has obtained its chief supply of rough lumber by purchasing timber tracts and contracting with sawmill operators to go on these tracts of standing timber to fell the trees, cut them into logs and saw the logs according to specifications given by Wall, and to deliver the lumber at its plant in Thomasville, North Carolina.

2. C. R. Monsees, a sawmill operator, of Southmont, North Carolina, began contracting with Wall in 1937, and has continued since that time to contract with Wall except for a short period during the latter part of 1942 and the early part of 1943. He became a covered and liable employer within the meaning of the Employment Security Law (formerly the Unemployment Compensation Law) during 1941 and such coverage was placed in suspense 1 October, 1942, but has never been terminated in accordance with the provisions of the law.

3. Under all the contracts between C. R. Monsees and Wall, Monsees has contracted to furnish Wall, at its factory in Thomasville, North Carolina, rough lumber cut according to specifications furnished by Wall, and at stipulated prices per thousand board feet, from tracts of timber belonging to Wall.

4. Since 1937, the services performed under contracts with Wall by Monsees have constituted approximately ninety per cent of the entire lumber operations of the said C. R. Monsees. During this time C. R. Monsees has purchased a few small tracts of timber, cut it, sawed it, and sold it to Wall, and on one or two occasions he purchased timber and sold the rough lumber to others.

5. Prior to 1 October, 1942, the said C. R. Monsees operated one sawmill and employed directly all the labor necessary to fell the trees, cut them into logs, transport the logs to his sawmill, saw them according to specifications set out in his contracts with Wall, and to transport and deliver the lumber to Wall's plant in Thomasville. Clay Carrick was employed by C. R. Monsees as a timber cutter, or tree feller, and was paid by Monsees on a board foot basis. During this period, Vestal Monsees, a brother of C. R. Monsees, was employed on an hourly basis as

a sawyer at the mill operated by C. R. Monsees. John Arville Cross also worked for C. R. Monsees occasionally and was paid by the hour.

6. On or about 1 April, 1943, C. R. Monsees resumed his business of furnishing rough lumber to Wall. He entered into an agreement with his brother, Vestal Monsees, whereby Vestal Monsees agreed to take the mill belonging to C. R. Monsees and operate it on tracts of timber belonging to Wall, and to saw the logs brought to the mill into rough lumber according to specifications furnished by C. R. Monsees. Vestal Monsees has received an agreed price per thousand board feet for all lumber sawed by him since 1 April, 1943, and has employed his own help. C. R. Monsees received no rent for his mill and made all major repairs to it. Vestal Monsees was not permitted to use the mill for any purpose other than sawing logs on the premises owned or controlled by Wall, without the express permission of C. R. Monsees. Vestal Monsees has at no time had the right to move the mill from one boundary of timber to another without specific permission and authorization of C. R. Monsees.

7. In 1946, C. R. Monsees purchased a new sawmill and entered into an agreement with John Arville Cross to operate it under the same contractual arrangements that Vestal Monsees operated the old mill.

8. Prior to 1 October, 1942, and subsequent thereto, Clay Carrick employed such individuals as he needed to assist him in felling the trees and cutting them into logs according to specifications, on premises under the control of C. R. Monsees, at a specified price per thousand.

9. Beginning in April, 1943, and continuing to the date of the hearing below, Joe Young, a logger, had an agreement with C. R. Monsees to log the mill operated by Vestal Monsees and was paid on a board foot basis.

10. On or about 1 January, 1948, C. R. Monsees entered into an agreement with Mozelle Tysinger to log the mill operated by Cross, from tracts of timber owned by Wall and under the control of C. R. Monsees.

11. C. R. Monsees knew that Vestal Monsees, John Arville Cross, Clay Carrick, Joe Young, and Mozelle Tysinger employed others to assist them in their work.

12. Subsequent to resumption of operations in 1943, there was no relationship between the respective individuals with whom C. R. Monsees entered into agreements hereinbefore mentioned. In each instance the agreement was by and between Monsees and the sawmill operator, the logger, and the timber cutter. The timber cutter was in no way responsible to the logger, and the logger was in no way responsible to the sawmill operator, but each was responsible only to C. R. Monsees in order to assist him in the performance of his contract with Wall.

Upon the facts found the Commission held that C. R. Monsees shall make reports and pay contributions to the Employment Security Commission of North Carolina on the earnings of Vestal Monsees, John

Arville Cross, Clay Carrick, Joe Young, and Mozelle Tysinger, as well as on the individuals employed by them and the individuals employed directly by C. R. Monsees from 1 April, 1943, and thereafter until such coverage is terminated in accordance with the provisions of the law.

Upon appeal to the Superior Court by the defendant, the order of the Commission was reversed. The Commission appealed to the Supreme Court and assigns error.

*W. D. Holoman, R. B. Overton, and R. B. Billings for Employment Security Commission, appellant.*

*T. S. Wall, Jr., and Charles W. Mauzé for C. R. Monsees, appellee.*

DENNY, J. As we interpret the record before us, there is no controversy between the plaintiff and the defendant as to the amount of contributions due the Employment Security Commission, if it is determined the defendant is liable for contributions under the Employment Security Law. Likewise, if it is determined that Vestal Monsees, John Arville Cross, Clay Carrick, Joe Young, and Mozelle Tysinger were employees of C. R. Monsees within the meaning of the Employment Security Law, then it is conceded that the defendant had in his employ in each of twenty different weeks in the years involved, eight or more individuals. G.S. 96-8 (f) (1).

Therefore, the sole question for our determination is whether the above-named individuals were employees of C. R. Monsees within the meaning of the Employment Security Law.

G.S. 96-8 (e), in pertinent part, reads as follows: " 'Employing unit' means any individual or type of organization . . . which has, on or subsequent to January 1st, 1936, had in its employ one or more individuals performing services for it within this state . . . Whenever any employing unit contracts with or has under it any contractor or subcontractor for any employment which is part of its usual trade, occupation, profession, or business, unless the employing unit as well as each such contractor or subcontractor is an employer by reason of subsection (f) of this section, or section 96-11 (c), the employing unit shall . . . be deemed to employ each individual in the employ of each such contractor or subcontractor . . . Each individual employed to perform or to assist in performing the work of any agent or employee of an employing unit, shall be deemed to be employed by such employing unit for all the purposes of this chapter whether such individual was hired or paid directly by such employing unit or by such agent or employee, provided the employing unit had actual or constructive knowledge of such work: . . ."

The defendant knew that his subcontractors were employing individuals to aid them in carrying out their respective contracts with him in order

that he might fulfill his contractual obligations to Wall. In fact, according to the record, C. R. Monsees kept the pay rolls for each of the individuals with whom he contracted to perform services for him and reported and paid the Federal old age and survival benefit insurance taxes to the Federal Government on the earnings of Vestal Monsees, Joe Young, Clay Carrick, and on the earnings of those employed to assist them in the performance of their agreements. All the taxes so paid were later deducted from the amounts due the respective individuals under their agreements which, in effect, placed the tax burden upon Vestal Monsees, Joe Young and Clay Carrick. The defendant also advanced wages to the employees of the above men and deducted such advances in his settlement with their employers.

In 1946, the Internal Revenue Collector called upon the defendant to pay the Federal unemployment tax whereupon amended social security returns were made accompanied by affidavits to the effect that Vestal Monsees, Joe Young and Clay Carrick were subcontractors and should file separate returns under the terms of the Social Security Act. The amended returns were accepted by the Federal Government.

The defendant contends that from and after 1 April, 1943, until the date of the hearing below, he was not a sawmill operator but merely a jobber, and that Vestal Monsees, Joe Young, Clay Carrick, John Arville Cross and Mozelle Tysinger were independent contractors, and that their work was not a part of his usual trade, occupation, profession, or business. This contention cannot be upheld in the light of the defendant's own testimony, which is as follows: "From 1937 up until the present time I have had several contracts with C. M. Wall and Son to fell trees from their property, have them logged and sawed into rough lumber, and delivered to their plant at Thomasville. I had individual contracts from time to time. The cutting and delivering of rough lumber under these contracts was part of my usual business whether I employed folks to process the lumber or whether I made contracts like I have since 1943. I placed the sawmills on the lands on which standing timber was, and on which C. M. Wall owned the timber rights, for the purpose of carrying out my contract with the company. I went on these lands from time to time and made the repairs to my sawmills. The property was under my control while I was carrying out this contract. I had my trucks to go out there and take this rough lumber and haul it from the sawmill on this property to Wall's plant. . . . I did not require my brother, Vestal Monsees, to pay any rent on the sawmill unless he did some custom sawing. I didn't make any arrangements about renting the sawmill to Vestal Monsees. I just told him to go out there, and that I would furnish the sawmill and would give him so much a thousand."

In determining the employer-employee relationship within the meaning of the Employment Security Law prior to its amendment by Chapter 424, Section 5, subsection (1), of the 1949 Session Laws of North Carolina, now codified as G.S. 96-8 (g) (1), we cannot be governed by the usual definition of what constitutes the master and servant relationship or the status of an independent contractor. The Act itself fixes the status of the employment and includes many individuals who would be excluded under the definition of master and servant, and principal and agent at common law. *Unemployment Compensation Com. v. Jefferson Standard Life Insurance Company,* 215 N.C. 479, 2 S.E. 2d 584; *Unemployment Compensation Com. v. Insurance Co.,* 219 N.C. 576, 14 S.E. 2d 689; *Young v. Bureau of Unemployment Compensation,* 63 Ga. App. 130, 10 S.E. 2d 412.

The individuals involved herein, according to the record, were subcontractors under C. R. Monsees and engaged in doing work which constituted part of his usual trade or business in felling trees, having them logged and sawed into rough lumber in accordance with the terms of his contract with Wall, and the services performed by these subcontractors were performed on premises under the control of C. R. Monsees, and were services which he had contracted with Wall to perform. He merely farmed out part of the work to Vestal Monsees, Joe Young, Clay Carrick, John Arville Cross, and Mozelle Tysinger, who were not independent contractors but employees of C. R. Monsees within the meaning of the provisions of the Employment Security Law. G.S. 96-8 (e).

Moreover, the Commission found the pertinent facts in its hearing below, which facts are supported by competent evidence and are binding upon review. G.S. 96-4 (m); *Employment Security Com. v. Kermon,* 232 N.C. 342, 60 S.E. 2d 580; *Employment Security Com. v. Distributing Company,* 230 N.C. 464, 53 S.E. 2d 674; *Employment Security Com. v. Roberts,* 230 N.C. 262, 52 S.E. 2d 890; *Unemployment Compensation Com. v. Harvey & Son Co.,* 227 N.C. 291, 42 S.E. 2d 86; *Unemployment Compensation Com. v. Willis,* 219 N.C. 709, 15 S.E. 2d 4. Furthermore, the facts found by the Commission support its judgment. *Cf. Employment Security Com. v. Tinnin, post,* 75, where the relationship was that of consignor and consignee and the contract was merely one for the sale of goods by a method well recognized and widely used in the sale of merchandise.

In our opinion, on the record before us, the plaintiff was entitled to an affirmance of the findings and conclusions reached by the Commission. *Employment Security Com. v. Kermon, supra; Employment Security Com. v. Distributing Co., supra; Unemployment Compensation Com. v. Harvey & Son Co., supra.* The judgment of the court below is

Reversed.